UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TODD LYNCH, | : | CIVIL ACTION NO. 3:03CV0381(MRK) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| KATHY MCNAMARA, | : | |
| TIMOTHY BARRY, and | : | |
| FRANK GRIFFIN, in their individual | : | |
| Capacities | : | |
| *Defendants* | : | MARCH 23, 2004 |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, the defendants, Kathy McNamara, Timothy Barry and Frank Griffin, in their individual capacities, hereby move for summary judgment in their favor, because they are entitled to judgment as a matter of law based upon the material facts not in dispute. The defendants also assert that all claims against them are barred by qualified immunity, and that the claims against Kathy McNamara are barred by absolute immunity.

I.    **INTRODUCTION**

This is a civil rights case brought pursuant to 42 U.S.C. §1983 by a state police sergeant against an assistant state's attorney and two other officers of the state police for purported violations of the plaintiff's due process rights. Through use of the civil rights laws, the plaintiff essentially seeks to overturn the results of one of the two internal affairs ("IA") investigations sparked by plaintiff's activities on the Statewide Firearms Trafficking Task Force ("Task Force") in November 2000.

In the first IA investigation, the charges were not sustained, whereby in the second IA investigation, one of the charges was sustained.  After the charge was sustained, plaintiff was given a paper disciplinary transfer to the Troop where he was already working.  Plaintiff then grieved the disciplinary transfer, and by stipulated agreement, the transfer was redesignated as an administrative transfer.

Because plaintiff essentially seeks to have this Court substitute its judgment for the policy and factual determinations made during the internal affairs investigation, plaintiff's claims should be summarily disposed forthwith.  Plaintiff does not have a protected property interest in either his troop assignment or hypothetical additional overtime opportunities.   Plaintiff received extraordinary due process in both IA investigations, in the form of notice, opportunity to respond, representation by the union and the breadth of witnesses interviewed.

Moreover, the specific defendants each have immunity from liability in this matter.  Plaintiff seeks to hold Assistant State's Attorney Kathy McNamara liable for her testimony as a witness during the IA investigation.  Plaintiff seeks to hold Colonel Timothy Barry liable by virtue of his supervisory position.  Finally, Plaintiffs seeks to hold Major Frank Griffin liable for imposing "disproportionate" discipline, even though Major Griffin had no role in the IA investigations.  In each of these three instances, it is well established that these three defendants are not liable under §1983 jurisprudence.

**II.    <u>FACTS</u>**

The plaintiff, Todd Lynch ("plaintiff," "Lynch" or "Sgt. Lynch"), has been employed by the Connecticut State Police since September 1987.  Statement of Material Facts ("SMF") ¶ 1.  Upon leaving the academy in late 1988, he was assigned to Troop K in

Colchester, and was subsequently transferred to Troop E in Montville in the early 1990s.  SMF ¶ 2.  He was promoted to Sergeant in 1997, transferred back to Troop K and acted as a patrol supervisor.  SMF ¶ 2.

At its inception in July 2000, Sgt. Lynch joined the Statewide Firearms Trafficking Task Force (the "Task Force"), reporting directly to Lt. Thomas Hogarty.  SMF ¶ 3.  After two citizen complaints were filed against him in early 2001, Lynch voluntarily transferred off the Task Force in April 2001 to Troop E in Montville.  SMF ¶ 4.  The transfer was his idea; no one suggested it to him.  SMF ¶ 4.

After he transferred back to Troop E, Lynch became a Community Policing supervisor, which is more prestigious than a patrol supervisor.  SMF ¶ 5.   He then was assigned to his current position as resident state trooper in Ledyard SMF ¶ 6.   As Ledyard's resident state trooper, he manages the entire Ledyard police force, and is answerable only to Ledyard's mayor and the Lieutenant at Troop E.  SMF ¶ 6.

A.    The Policy and Contractual Framework for IA Investigations

Chapter 5 of the State Police Administrative & Operations ("A&O") policy manual sets forth the procedures for internal investigations.  SMF ¶ 8.  The department must investigate all citizen complaints made to it that are (i) reduced to writing; (ii) oral and subsequently reduced to writing; (iii) oral concerning criminal behavior; or (iv) any charge the Department is required by law to investigate.  SMF ¶ 12.[1]

---

[1] The union contract states that citizens who complain about Trooper conduct "shall be encouraged" to "identify themselves;" and to "reduce their complaint to a written statement promptly, normally within ten days" of the oral complaint.  SMF ¶ 10.  "An oral complaint which is not promptly reduced to writing … shall not be investigated" unless it is a criminal charge, or "a charge which the Department is otherwise required by law to investigate."  SMF ¶ 10.  The contractual provision does not require that the citizen complaint be brought within ten days of the incident.  SMF ¶ 11.

The more serious citizen complaints are typically investigated by the Internal Affairs Unit.   SMF ¶ 13.  There, an investigator is assigned to the complaint.  The investigator's conclusions and findings must be written up in a report with his or her conclusions.  SMF ¶ 14.  Both the report and its conclusions are then sent up the chain-of-command, with each level being required to sign-off on the report and its conclusions.  SMF ¶ 14.  For the two Lynch IA Investigations, the investigator was Sgt. Paul Kenefick, who reported to Lt. Sarah Kasacek, who reported to Captain Paul Samuels in the Internal Affairs Unit.  SMF ¶ 15.  Once the Unit approved of the report and its conclusions, it would be sent to the Colonel's office for review and approval.  SMF ¶ 15.  Internal affairs reports commonly go up and down the chain of command with changes and suggestions.  SMF ¶ 63.

The ultimate disposition of an IA investigation is made by a commander or manager who is delegated the responsibility by the Commissioner.  SMF ¶ 16.   For purposes of the two IA investigations regarding Sgt. Lynch, Colonel Timothy Barry was delegated the responsibility by the Commissioner.  SMF ¶ 17.  Colonel Barry had final say as to the result of the Lynch IA investigations.  He could reverse every single finding of the investigator.  SMF ¶ 18.   Under the Union contract, Sgt. Lynch has the right to grieve the results of an internal affairs investigation.  SMF ¶ 23.

B.     The Anderson IA Investigation

Lynch was the subject to two IA investigations arising out of Task Force arrests conducted in November 2000.  SMF ¶ 24.   The first IA investigation, given case number IA01-001, arose from a  complaint filed on January 3, 2001 by the State's Attorney's Office.  The State's Attorney's Office alleged that Sgt. Lynch supervised an

investigation that ultimately lead to an improper arrest of Tye Anderson on November 2, 2000, lacking probable cause.  SMF ¶ 25.  The compliant also alleged that Sgt. Lynch threatened a witness to the investigation in order to obtain a statement from her.  SMF ¶ 25.  The State's Attorney's Office complaint indicated that Sgt. Lynch had pushed matters too close to the edge in the Anderson arrest and in threatening a witness about DCF.  SMF ¶ 26.

Lynch was given notice of the State's Attorney's January 3, 2001 complaint on January 4, 2001 SMF ¶ 27.   Lynch does not contend that the IA unit failed to give him timely notice.  Id.  Although the Anderson IA investigation was initially assigned to Sgt. Edward Gould, Sgt. Gould recused himself, because he was friends with Sgt. Lynch.  SMF ¶ 28.  The Anderson IA investigation was then assigned to Sgt. Paul Kenefick on January 6, 2001.   SMF ¶ 28.

With respect to the Anderson IA Investigation, Kenefick interviewed nine witnesses, interviewing Lynch last.  SMF ¶ 30.  Lynch was accompanied by his union representative Jeremiah McGuire during his interview.  SMF ¶ 30.  Lynch believes that Kenefick's investigation in the Anderson IA investigation was fair and impartial.  SMF ¶ 32.   Lynch's only procedural concern with the Anderson IA investigation was his view that Gould was "removed" from the investigation.  Id.

Kenefick was assigned to the Internal Affairs Unit from May 19, 2000 until he transferred from the Internal Affairs Unit on August 10, 2001 to accommodate personal scheduling needs.  SMF ¶¶ 29, 55.  At the time he transferred out, both Lynch IA investigations were complete, but neither report had been drafted.  SMF ¶ 29.

On September 23, 2001, Kenefick submitted his investigatory report on the Anderson IA Investigation, case number IA01-001.  SMF ¶ 33.   In his report, Kenefick exonerated Lynch on the improper arrest charge, and found as "unfounded" the charges of conduct unbecoming of an officer, and improper decorum.  SMF ¶ 33.

On October 1, 2002, Colonel Barry agreed with Kenefick's recommendations and held that with respect to the State's Attorney's Office complaint regarding the Anderson arrest, the charges against Sgt. Lynch were exonerated and unfounded.  SMF ¶ 34.

C.    The Rodriguez IA Investigation

Ruben Rodriguez was suspected to be an illegal gun dealer, as he had been flagged as a high volume purchaser of guns but had none of the firearms in his possession.  SMF ¶ 36.   During the evening of November 28, 2000, Lynch arrested Rodriguez because he had not given notice of his change of address on his pistol permit within thirty (30) days.  SMF ¶ 37.   Lynch did not have probable cause to arrest Rodriguez for any other firearm charge.  SMF ¶ 37.

The normal procedure for an arrest is to bring the prisoner to a police station or troop barracks, to read him his rights, fingerprint him, photograph him, hold him into a cell and/or release on bond.  SMF ¶ 38.   Rather than bringing Rodriguez to the barracks to be processed, Lynch brought Rodriguez back to the Task Force Offices. Rodriguez was read his rights and informed of the charges, but received none of the other usual procedures.  SMF ¶ 39.

During his interview at the Task Force Offices, Rodriguez eventually confessed that he had sold the guns "on the streets of Hartford".  SMF ¶ 40.   Lynch then signed Rodriguez up as a confidential informant and released him.  SMF ¶ 41.

6

Lynch did not document the arrest or subsequent release of Rodriguez.  SMF ¶ 42.   Lynch did not even document that Rodriguez was transported back to the Task Force's office to be interrogated, rather than to a Troop barracks or local police station to process the arrest.  SMF ¶ 42.   The only paperwork generated was the report of Rodriguez signing up as a confidential informant, his witness statement, a property seized report and an investigation report that noted that an arrest was still "pending."  SMF ¶ 43.

Lynch contends that he released Rodriguez under the direction of Assistant State's Attorney Cathy McNamara, pursuant to a telephone call to her house.  SMF ¶ 44.   Attorney McNamara denies knowing that Rodriguez was under arrest when she spoke with the Task Force.  SMF ¶ 45.   Rather, McNamara contends that the first time she was aware that Rodriguez had been arrested on November 28, 2000 was after Rodriguez came to court in January 2001 for his arrest pursuant to a subsequent warrant for his illegal sale of guns.  Id.

On March 28, 2001, Ruben Rodriguez made a citizen complaint against Todd Lynch.  SMF ¶ 46.   As set forth in the written report of the complaint, Rodriguez made:

> Allegations of improper arrest/detaining of subject and threats toward subject in order to obtain a written statement.  Also allegations of conducting a search of a residence without proper consent and failure to maintain the privacy of a registered "confidential informant".

SMF ¶ 46.

The complaint summarized Rodriguez's charges as:

> The complainant has made allegations stating he was handcuffed and detained for an extended period of time and later released without being arrested.  The Complainant also alleges that when he was "taken into custody" at his girlfriend's residence, his girlfriend was coerced into giving consent to search her apartment.  The Complainant

also states that he signed papers registering him as a "confidential informant" and his identity was later released to the media by the State Police.

SMF ¶ 47.

The A&O policy manual has a procedure to address the release of or "un-arrest" of prisoners.  Section 19.1.16(a)(2) states:

no arrest shall be voided, reduced, or dismissed against a suspect except by authorization of the court of jurisdiction (except 19.1.18c). In all other situations officers may not "unarrest" anyone.

SMF ¶ 48.

The Rodriguez IA investigation was assigned to Sgt. Paul Kenefick on March 27, 2001, and given case number IA01-024. SMF ¶ 49.  Lynch was provided a hand-delivered copy of the March 28, 2001 Rodriguez complaint on March 29, 2001.  SMF ¶ 50.  Lynch does not contend that the department did not give him timely notice.  SMF ¶ 50.

With respect to the Rodriguez IA Investigation, Kenefick interviewed eleven witnesses, including Lynch, who was represented by his union representative, Jeremiah McGuire, during the August 1, 2001 interview.  SMF ¶¶ 52-54.  Lynch believes that Kenefick's investigation in the Rodriguez IA investigation was fair and impartial.  SMF ¶ 56.

On August 12, 2001, Kenefick transferred out of the Internal Affairs Unit, but maintained the responsibility to issue reports in the two Lynch investigations.  SMF ¶ 55. Kenefick submitted the Anderson IA Report on September 23, 2001.  SMF ¶ 33.  On November 6, 2001, Kenefick submitted his completed report on the Rodriguez IA Investigation to his supervisors for review.  SMF ¶ 57.

Although in his Initial Report, Kenefick found Rodriguez's charges against Sgt. Lynch were unfounded, Kenefick noted that Lynch should have recorded his actions of the arrest and release of Ruben Rodriguez on the night of November 28, 2000.  SMF ¶ 58.  Sgt. Kenefick's immediate supervisor, Lt. Sarah Kasacek, disagreed with Sgt. Kenefick's conclusion of not sustaining a charge regarding the arrest and release of Rodriguez.  SMF ¶ 59.  The same day Kenefick's report was submitted, Lt. Kasacek contacted the Department's Labor Relations Unit for "guidance in regards to the issue of Mr. Rodriguez being taken into custody, the nullification of arrest and the failure to document such actions."  SMF ¶ 60.

On or about November 20, 2001, the labor relations unit advised that an additional violation of failing to document the activities of November 28, 2000 should be sustained.  SMF ¶ 61.  Kenefick had "no problem" with the suggested change and resubmitted his report.  SMF ¶ 61.  With the issue now sustained, Captain Samuels signed off on the report on November 20, 2001 and forwarded it to Lt. Sweetman in the Colonel's office for review.  SMF ¶ 62.  At that point, Kenefick's involvement with the Rodriguez IA Investigation ended.  SMF ¶ 64.

Kenefick thought that "reasonable minds could differ" as to whether Lynch had violated the A&O policy manual's nullification of arrest provision.  SMF ¶ 65.  Kenefick interpreted the provision "court of jurisdiction" in section 19.1.16(a)(2) as meaning Attorney McNamara.  SMF ¶ 65.  Moreover, Kenefick believed Lynch and disbelieved McNamara regarding the content of the telephone call(s) of November 28, 2000.  SMF ¶ 66.  However, the factual dispute between Lynch and McNamara would not impact how

the Department could interpret the "court of jurisdiction" requirement in section 19.1.16(a)(2).  SMF ¶ 66.

On or about November 30, 2001, the Rodriguez IA Investigation was sent back to the Internal Affairs Unit, with instructions to add Lynch's supervisor, Lt. Thomas Hogarty as a subject of the IA.  SMF ¶ 68.  Because the additional subject of the investigation was of a higher-rank than Sgt. Kenefick, it would not have been appropriate for Kenefick to conduct the expanded investigation.  SMF ¶ 69.  Moreover, Sgt. Kenefick had transferred out of the Unit more than three months previously.  SMF ¶ 69.

Lt. Kasacek conducted the expanded investigation from December 2001 through January 2002.  SMF ¶ 70.  On or about December 6, 2001, Lt. Thomas Hogarty was given notice that IA01-024 had been expanded to include him.  SMF ¶ 71.  He objected to being investigated by someone who held his own rank, so the investigation was re-assigned to Capt. Lapacrucia, with Lt. Kasacek's continued assistance.  SMF ¶¶ 71, 73.

Both Lapacrucia and Kasacek agreed that the subjects of the investigation needed to be re-interviewed.  SMF ¶ 74.  Lynch and Hogarty were re-interviewed, as well as Kathy McNamara.  SMF ¶¶ 72, 75.

On or about March 19, 2002, Lt. Kasacek and Captain Lacaprucia submitted their report on the investigation.    Lt. Kasacek drafted the full report and Capt. Lacapruci drafted the executive summary.  SMF ¶ 78.  In their report, they recommended that the charge of incompetence against Lt. Hogarty be not sustained.  SMF ¶ 79.  For the charges against Sgt. Lynch, they recommended that the improper arrest, improper consent to search, and decorum charges be either unfounded or not sustained.  SMF ¶

10

79. They recommended that the charge of improperly releasing prisoners in violation of section 19.1.16(a)(2) be sustained.  Id.

Captain Lacaprucia and Lt. Kasacek were quite troubled by Sgt. Lynch's actions after the arrest of Rodriguez.  SMF ¶ 80.  Sgt. Lynch should have brought the prisoner to a police department or a troop barracks, not back to the Task Force Offices.  Id.  He should have properly processed the prisoner, including fingerprints and filling out a prisoner processing report and an arrest report.  Id.  They were concerned that he subsequently "un-arrested" the prisoner, with virtually no record of either the arrest or the "un-arrest".  Id.  They had absolutely no doubt that he violated section 19.1.16c of the A&O manual.  Id.

On or about April 9, 2002, Colonel Barry agreed with their conclusions, and sustained the charge against Lynch of improperly releasing a prisoner.  SMF ¶ 81.  At that point, the IA Unit had no further role in the matter.  The IA Unit does not suggest or impose discipline.  SMF ¶ 81.

D.    Discipline Imposed due to the Rodriguez IA Investigation

Major Frank Griffin is the Commanding Officer of the Bureau of Investigations. SMF ¶ 82.  Because Sgt. Lynch was working in the Statewide Firearms Task Force within the Bureau of Investigations during the incidents underlying the Rodriguez IA Investigation, when a charge was sustained in that investigation, it became Major Griffin's responsibility to administer the discipline applied.  SMF ¶ 82.  Major Griffin had no role in the IA Investigations.  Id.

Major Griffin did not make the decision as to what type of discipline would be imposed upon Sgt. Lynch for the charge sustained in the Rodriguez IA Investigation.

11

SMF ¶ 83.  Rather, the Labor Relations Department reviewed the sustained charge, compared the matter with the discipline imposed in other IA Investigations, and made a recommendation to the Colonel as to the appropriate level of discipline to be applied. Id.  Once the Colonel agreed with the recommendation, the discipline to be imposed was conveyed to Major Griffin.  Id.

For the sustained charge against Lynch in the Rodriguez IA Investigation, Major Griffin was informed that the consequences should consist of (i) an oral counseling reduced to writing; and (ii) a disciplinary transfer to Troop E.  SMF ¶ 84.[2]

On or about April 25, 2002, Sgt. Lynch received written notice to meet with Major Frank Griffin on April 30, 2002 in order to receive the discipline for his un-arrest of Ruben Rodriguez, with an attached copy of the completed investigation.  SMF ¶ 85.

On or about April 30, 2003, Sgt. Lynch and Lynch's union representative met with Major Griffin, and Lynch received a disciplinary transfer to Troop E and an Oral Counseling Reduced to Writing for his un-arrest of Ruben Rodriguez.  SMF ¶ 86.

Sgt. Lynch's disciplinary "transfer" to Troop E was a paper transfer only, for he was transferred to a Troop where he had already been working for a year.  SMF ¶ 88. Sgt. Lynch retained his same rank, same base pay, normal union steps in pay raises and obtained even more prestigious positions after the "transfer".  SMF ¶ 89.  Lynch's current position as Resident State Trooper at Ledyard is a more lucrative than his position as a sergeant on the Task Force.  SMF ¶ 90.

---

[2] An oral counseling reduced to writing is not considered to be a disciplinary action.  SMF ¶ 87.

     E.   <u>Union Grievance</u>

Within 20 days of imposition of discipline on April 30, 2002, Lynch filed a timely grievance regarding the disciplinary transfer.  SMF ¶ 93.   In his grievance he was seeking compensation for lost wages, and his only lost wages claim was for lost overtime opportunities.  SMF ¶ 93.   A state trooper has no contractual, statutory or legal right to overtime hours.  SMF ¶ 92.   On or about November 1, 2002, Lynch settled his grievance by a Stipulated Agreement that changed the designation of the transfer from disciplinary to administrative.  SMF ¶ 94.

     F.   <u>Plaintiff's Claims Against the Individual Defendants</u>

Lynch's claims against Colonel Barry are not that he directly manipulated the investigative process, but because he has "overall control of what is happening within the agency."  SMF ¶ 95.   Lynch's claim against Colonel Barry is based upon Colonel Barry's position, not because of what Barry personally did.  SMF ¶ 95.

Lynch's claim against Major Griffin is that his discipline was disproportionate.  SMF ¶ 96.  Lynch's sole claim against Assistant State's Attorney Kathy McNamara is his view that she "flat-out lied" during the IA Investigation.  SMF ¶ 97.

## III.   **STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, this Court should grant summary judgment when "there is no genuine issue as to any material fact...and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In cases such as this, where the movant is the defendant, that party must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of his claim.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  The movant's burden is

"discharged by showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact.  Celotex, 477 U.S. at 325.  The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial."  Id. at 324.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

To grant a motion for summary judgment in favor of the defendant, the court does not need to find that there is literally no evidence in favor of the plaintiff.  "The judge's inquiry...unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party...upon whom the onus of proof is imposed.'"  Liberty Lobby, 477 U.S. at 252.

Thus, an issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative."  Liberty Lobby, 477 U.S.  at 250.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.  A fact is not material unless it is, under controlling substantive law, an essential element of the nonmoving party's case with respect to which he has the burden of proof at trial.  Id. at 248.  Thus, to survive a motion for

summary judgment, the nonmoving party must come forward with specific evidence of every essential element of his case so as to create a genuine issue for trial. Celotex, 477 U.S. at 323; Larkin v. Town of West Hartford, 891 F. Supp. 719, 723 (D. Conn. 1995), *quoting* Celotex.

## IV.    ARGUMENT

Plaintiff's due process challenge to the internal affairs investigations against him fails as a matter of law, for plaintiff does not have a protected property right in either his troop assignment or overtime pay opportunities.  Plaintiff also was afforded exemplary procedural due process:  he had virtually immediate notice of the claims against him; he was represented by his union throughout the investigation; and he was personally interviewed twice.  Fatal to his due process claim here, plaintiff also had and used the state trooper collective bargaining procedures to address the discipline imposed at the conclusion of the internal affairs investigation.  He filed and settled his grievance, whereby his disciplinary transfer was down-graded to an administrative transfer.  Plaintiff simply does not have a procedural due process claim.

Plaintiff's claim also fails against these particular defendants, for, as plaintiff concedes, neither Colonel Barry nor Major Griffin had any personal involvement in the conduct of the IA investigations he claims were deficient.  Plaintiff's claims against Assistant State's Attorney McNamara are barred by absolute immunity, for his sole claim against her concerns her testimony as a witness during the internal grievance procedure.  Finally, all three defendants have qualified immunity as to plaintiff's claims, for no reasonable government official could be on notice that their actions in this matter in any way implicated plaintiff's constitutional rights.

A.    **Plaintiff Does Not Have the Protected Property Interest Necessary to Support a Procedural Due Process Claim.**

Plaintiff voluntarily transferred out of the Task Force a year before the internal investigation results were final.  SMF ¶ 4.  As a result of the internal investigation, the plaintiff was transferred from the troop he currently was in, Troop E, to the exact same troop he was in, Troop E.  SMF ¶ 88.  He maintained the same rank, same pay scale, and by his own admission, obtained even more prestigious duties with more responsibilities.  SMF ¶ 89.  Although he made more money in overtime after his transfer, he contends nonetheless that he lost overtime opportunities when he left the Task Force.  Neither the paper transfer from Troop E to Troop E nor the purported loss of overtime opportunities from the Statewide Firearms Task Force are protected property interests sufficient to implicate procedural due process rights.

"In order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest."  White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1060-61 (2d Cir. 1993) (internal citations omitted).  "The Fourteenth Amendment's procedural protection of a property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Board of Regents v. Roth, 408 U.S. 564, 576 (1971).  To establish a property interest, a plaintiff must demonstrate more than an abstract need or desire for it, and more than a unilateral expectation; he must instead show that he had a legitimate claim of entitlement, arising form some independent basis in law.  Roth, *supra*, 408 U.S. at 577.  "Not every contractual benefit rises to the level of a constitutionally protected property interest."  Ezekwo v. NYC Health & Hosp. Corp., 940 F.2d 775, 782 (2d Cir. 1991).

16

"The right to work overtime is not a constitutionally protected property interest." Barton v. City of Bristol, 294 F. Supp. 2d 184, 197 (D. Conn. 2003), *citing* Caniello v. City of New York, 2001 U.S. Dist. LEXIS 20 *1 - *2 (S.D.N.Y. 2001). "Where an employee has retained his rank and base pay after an administrative action, courts have not found an unconstitutional deprivation of property." Id. The desire to work overtime is "at best an expectation rather than an entitlement." Id.

In the case at bar, plaintiff has no contractual right to overtime. SMF ¶ 92. Plaintiff has no statutory right to overtime. Id. Plaintiff has no legal right to overtime. Id. Overtime is purely at the discretion of the department, and thus the purported loss of overtime cannot create a constitutionally protected property interest.

Likewise, the plaintiff does not have a constitutionally protected property interest in his position on the Statewide Firearms Trafficking Task Force. As an initial matter, plaintiff voluntarily transferred from the Task Force to Troop E almost a full year before the internal affairs investigation was completed. Nonetheless, even if he had been involuntarily transferred from the Task Force to Troop E, he still does not have a protected property right on being on the Task Force.

The Connecticut district court's recent decision in Barton v. City of Bristol, 294 F. Supp. 2d 184 (D. Conn. 2003) is illustrative on this point. In Barton, the plaintiff is alleged to have had a public argument with his superiors, bordering upon insubordination. The plaintiff denied the facts underlying the charge. Nonetheless, the plaintiff was involuntarily removed from the Emergency Response Team ("ERT") because of the argument. Department rules permitted a removal from the ERT only for "a serious, sustained violation of the code of Conduct as determined by the Chief of

Police and ERT Commander."  294 F. Supp. 2d at 192.  His transfer did not result in any changes to his base salary, seniority, ranking or title.  Id.  Plaintiff contended that he had a protected property interest on being on the ERT, and that he lost overtime, training opportunities and the "general benefit" of being a member of ERT.  Id.  He brought, in part, a procedural due process and substantive due process claim under the Fourteenth amendment through 42 U.S.C. § 1983.  294 F. Supp. 2d at 196.  He also brought a grievance regarding the removal.  294 F. Supp. 2d at 192.

The Barton court granted summary judgment to the employer on all grounds.  For purposes of Barton's due process claims, the court held that he had neither a property or liberty interest in either overtime or membership on the ERT.   294 F. Supp. 2d at 197.  The Barton court's ruling is well-supported by the case law.  "A public employer enjoys wide latitude in managing its office . . ., and injury to reputation alone, … does not deprive an individual of a liberty or property interest protected by due process." White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1057, 1062-63 (2d Cir.), *cert. denied*, 510 U.S. 865 (1993).  "The due process clause does not protect trivial aspects of the public employee's relationship with her employer."  McNill v. NYC Dept of Correction, 950 F. Supp. 564, 572 (S.D.N.Y. 1996); Brown v. Brienen, 722 F.2d 360, 365 (7th Cir. 1983) ("disputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objects of the Fourteenth Amendment.")

Thus, a police officer has no constitutional interest protected by the due process clause in a job assignment, overtime opportunities or vacation dates.  Altman v. Hurst, 734 F.2d 1240, 1243 (7th Cir.), *cert. denied*, 469 U.S. 982 (1984).  In Altman, a police sergeant was transferred to a fixed post in full public view, and then was reassigned to

foot patrol duty.  While the Court sympathized with the plaintiff, they "recognized that permitting him to maintain [a federal action] would open the federal flood gates to all manner of petty personnel disputes."  Altman, 743 F.2d at 1244.  See also Kane v. Krebser, 44  F. Supp. 2d 542, 549-50 (S.D.N.Y. 1999) (police sergeant has no property interest in particular shift).

The courts have found that work assignment  decisions far more serious than those at issue here fail to implicate a protected property interest, such as being having coaching duties eliminated and teaching duties reassigned, Townsend v. Vallas, 256 F.3d 661, 676 (7th Cir. 2001); being denied the right to serve as school superintendent, Kinsey v. Salado Indep. Sch. Dist., 950 F.2d 988, 997 (5th Cir.) (en banc), *cert. denied*, 504 U.S. 941 (1992); being suspended for five days without pay, Larsen v. Lynch, 1998 U.S. Dist. LEXIS 21932, *18 -*19 (D. Conn. Mar. 31, 1998); being made to teach middle school instead of primary school, Lewandowski v. Two Rivers Pub. Sch. Dist., 711 F. Supp. 1486, 1495-96 (E.D. Wis. 1989), and even being terminated from employment completely as long as defendant continued to pay plaintiff her salary.  Cannon v. Beckville Indep. Sch. Dist., 709 F.2d 9, 11 (5th Cir. 1983).  *See* Kane v. Krebser, 44 F. Supp. 2d 542, 549-50 (S.D.N.Y. 1999).

Plaintiff's procedural due process fails as a matter of law, for, even assuming everything plaintiff asserts is true, he does not have a protected property interest in either his former position on the Task Force or in overtime opportunities.[3]

---

[3] Plaintiff is vague as to whether or not he is making a substantive or procedural due process claim.  Because his claims focus upon procedural issues, it appears that he is pursuing a procedural due process claim.  Moreover, his facts as alleged in no fashion meet the standards for substantive due process, that provides protection "only against egregious conduct which goes beyond merely offending some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience."

**B.     Plaintiff Was Afforded Procedural Due Process Far in Excess of the Constitutional Minimum.**

Unfortunately, it is not unusual that a governmental employee, police officer or firefighter is unhappy with his or her employer's disciplinary process, particularly when the process finds that the employee violated a rule or policy, and the employee is subject to discipline.  Such events do not a federal constitutional due process case make.  In fact, when such an employee is terminated for such alleged misconduct, the employee still is entitled to only minimal due process protections, as long as more comprehensive due process remedies are available post-termination.  Further, allegations that the process was biased or unfair typically do not give rise to a constitutional due process claim.

Even assuming, *arguendo,* that the plaintiff had a property or liberty interest in his position on the Task Force or in overtime opportunities, which he clearly does not, he was provided with substantially more process than is constitutionally required.  "The essence of due process is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it."  Mathews v. Eldridge, 424 U.S. 319, 348 (1976) (internal quotation marks omitted); City of Los Angeles v. David, 538 U.S. 715 (2003).  Ordinarily, the due process clause of the Fourteenth Amendment requires that a state or local government afford persons 'some kind of a hearing' prior to depriving them of a significant liberty or property interest."  Locurto v. Safir, 264 F.3d 154, 172 (2d Cir. 2001).

---

Smith v. Half Hollow Hills Central School District, 298 F.3d 168, 173 (2d Cir. 2002); Barton, *supra*, 294 F. Supp. 2d at 198.

The Second Circuit's decision in Munafo v. Metropolitan Transp. Authority, 285 F.3d 201 (2002) provides the framework for analyzing due process claims in public employment.  In Munafo, a transit worker union vice president was terminated for insubordination, and he alleged that the disciplinary actions taken up to and including termination were in retaliation for his union activities and numerous safety complaints. 285 F.3d at 204-209.  The worker had gone through several levels of disciplinary hearings, and subsequent union grievances.  The trial court denied the transit authority's motion to dismiss.

The Second Circuit reversed the Munafo trial court's decision, holding that the district court should have granted the motion to dismiss on qualified immunity grounds because the plaintiff had failed to provide a cognizable due process claim against the defendants.  285 F.3d at 210.[4]  Although the plaintiff in Munafo had alleged that the disciplinary procedures were "infected with bias and, as applied, did not provide due process," the Second Circuit noted that the plaintiff had notice of the claims and an opportunity to provide his side of the story under the employer's disciplinary procedures, and also had the right to bring a union grievance.  285 F.3d at 210-14.  Under those circumstances, the Court held that the plaintiff failed to present a cognizable due process claim.  285 F.3d at 214.  Because plaintiff did not have a due process claim, the Court held that the district court should have granted the motion to dismiss on qualified immunity grounds.

---

[4] At the case at bar, the defendants filed two motions to dismiss.  Plaintiff responded to the first motion to dismiss by filing an amended complaint.  The second motion to dismiss was still pending when this matter was transferred to the Honorable Mark Kravitz.  Upon the court's suggestion, due to the stage of discovery, the defendants withdrew their second motion to dismiss without prejudice, and are, in its place, submitting this motion for summary judgment.

Here, plaintiff had notice of the public complaints against him hand-delivered the day after they were made.  Plaintiff utilized his right to have union representation during the internal affairs investigation, and the union representative was present during the two interviews conducted of the plaintiff.   The interviews were held late in the process where plaintiff had the opportunity to explain his views on the evidence.  SMF ¶ 30.  Plaintiff himself concedes that the <u>conduct</u> of the investigation was fair and impartial.  SMF ¶¶ 32, 56.

Plaintiff's real complaint is with the <u>result</u> of the second internal investigation.  The plaintiff admits he arrested the suspect, brought him in for questioning to the Office rather than a barracks, and then "un-arrested" the suspect, all without a single written note or report about his actions.  SMF ¶¶ 37, 39, 41, 43.  Plaintiff concedes that upper management, as the designee of the Commissioner, had full discretion to follow or reject an investigator's recommendations.  SMF ¶ 18.  Nonetheless, Plaintiff fixates on the initial views of the investigator, conveniently ignoring that even the initial investigator sustained a charge against him.  The plaintiff disagrees with upper management's decision in his case, and invites this Court to second-guess the policy and factual determinations of the internal affairs investigation.  That is not the Court's role.  Plaintiff's due process claim fails as a matter of law.

**C.** **Assuming *Arguendo* That He Had a Protected Property Right and Inadequate Pre-Deprivation Procedures, Plaintiff Had and Utilized An Adequate Post-Deprivation Remedy.**

Even if plaintiff had a protected property right in his position on the Task Force, or in overtime opportunities, and even if the internal affairs investigatory process did not

provide sufficient procedural safeguards, plaintiff's due process claim still lacks any merit, because the plaintiff had and utilized an adequate post-deprivation remedy.

In Parratt v. Taylor, 451 U.S. 527, 541-544 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986), the Supreme Court held that an individual may not bring an action under 42 U.S.C. § 1983 for deprivation of property without due process of law if he has access to a meaningful post-deprivation state law remedy.  The Parratt doctrine applies where "the loss is not the result of some established state procedure and the State cannot predict precisely when the loss will occur."  Parratt, 451 U.S. at 541.  In other words, Parratt applies to deprivations due to a "random and unauthorized act" by a state employee.  Id.  The Supreme Court has extended Parratt to intentional conduct by state actors, Hudson v. Palmer, 468 U.S. 517, 533 (1984), and to claims of deprivation of liberty without due process.  Zinermon v. Burch, 494 U.S. 113, 132 (1990).

"Courts have held that such post-deprivation procedures [a grievance and arbitration procedure], providing for a hearing to contest a challenged employment decision, are sufficient to satisfy due process.  Harhay v. Town of Ellington Bd. of Ed., 323 F.3d 206, 213 (2d Cir. 2003), citing Narumanchi v. Bd. of Trustees of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988) (post-suspension grievance procedures sufficient due process to address suspension without pay); Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir. 2002) (pre-deprivation notice and "the full arbitration afforded by the collective-bargaining agreement were more than sufficient to satisfy" due process requirements).

23

After he received notice of the internal affairs investigation conclusion, and received his paper transfer from Troop E to Troop E, the plaintiff filed a grievance, pursuant to his collective bargaining rights.  SMF ¶ 93.  Several months later, he settled his grievance, whereby his disciplinary transfer was recategorized as an administrative transfer.  SMF ¶ 94,  Plaintiff had a post-deprivation remedy, and he used it.  His procedural due process claim is fatally flawed, and the defendants are entitled to judgment as a matter of law.

**D.**     **Colonel Barry and Major Griffin Were Not Sufficiently Personally Involved to Support a Finding of Individual Liability Under Section 1983.**

Plaintiff contends that Colonel Barry is liable because he is the overall supervisor of the department and signed off on the internal affairs investigation result.  SMF ¶ 95.  Plaintiff contends that Major Griffin is liable because he imposed discipline based upon the internal affairs investigation result.  SMF ¶ 96.  Neither Colonel Barry nor Major Griffin had any role in the process of the internal affairs investigation, and thus cannot be liable for a procedural due process claim attacking the results of an internal affairs investigation.  Moreover, Colonel Barry cannot be held liable under a respondent superior theory.

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected,' the complainant to a deprivation of rights secured by the Constitution and laws."  Rizzo v. Goode, 423 U.S. 362, 370-71 (1976) (*quoting* 42 U.S.C. §1983).  Where damages are sought in a §1983 action, the individual defendant must be responsible for the alleged constitutional deprivation.  Thus, an allegation of personal involvement is a necessary prerequisite for a valid cause of action under §1983, and a plaintiff must demonstrate the defendant's direct or personal involvement in the actions that are

24

alleged to have caused the constitutional deprivation.  Rizzo v. Goode, 423 U.S. 362,
376-378 (1976); Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986).  See Gill v.
Mooney, 824 F.2d 192, 196 (2d Cir. 1987).

    Consistent with the requirement that personal involvement is required for a claim
under §1983, the Supreme Court has ruled that the general doctrine of *respondeat
superior* does not suffice to state a claim under §1983.   Monell v. New York City Dept.
of Social Services, 436 U.S. 658, 692-95 (1978).  An official cannot be held liable
merely because he or she occupies a high position in the government agency hierarchy.
Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995).  It is well settled law that individual
cannot be founded on official position alone.  Horowitz v. Anker, 437 F.Supp. 495, 504
(E.D.N.Y. 1977), aff'd mem. 578 F.2d 1368 (2d Cir. 1978); McKinnon v. Patterson, 568
F.2d 930, 934 (2d Cir. 1977), cert. denied, 434 U.S. 1087 (1977); Williams v. Vincent,
508 F.2d 541, 546 (2d Cir. 1974).

    In order to state a cognizable claim, the plaintiff must allege, and ultimately
prove, "personal involvement of [the defendants] sufficient to support their liability for
wrongful acts," not merely their "linkage in  the  . . . chain of command."  Ayers v.
Coughlin, 780 F.2d 205, 210 (2d Cir. 1985).  A public official can only be liable if the
official causes the harm.  Baker v. McCollan, 443 U.S. 137, 142, 99 S. Ct. 2689, 2693
(1979); Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985). "[T]here must
be some showing of personal responsibility" to support an individual capacity damages
claim.  Duchesne v. Sugarman, 566 F.2d 817, 830 (2d Cir. 1988); Alfaro Motors, Inc. v.
Ward, 814 F.2d 883, 886 (2d Cir. 1987); Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.
1987); Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985).  "A plaintiff must thus allege

25

a tangible connection between the acts of the defendants and the injuries suffered."

Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986).

By the undisputed facts, Major Griffin had no role in the internal affairs investigatory process.  SMF ¶ 82.  By plaintiff's own admission, Colonel Barry approved a sustained charge brought to him, and did not even know about Kenefick's initial finding of "not sustained."  SMF ¶ 95.  As such, they lack sufficient personal involvement for §1983 liability.

**E.    The Claims Against Attorney McNamara are Barred by Absolute Immunity.**

Attorney McNamara at all times relevant to the complaint served as an Assistant State's Attorney.  As plaintiff concedes, his sole factual complaint against Assistant State's Attorney McNamara is that she was interviewed by the internal affairs investigators, and he contends that she lied during her interviews.  SMF ¶ 97.  Attorney McNamara has absolute immunity with respect to plaintiff's claims.

Absolute immunity prevents claims for damages under §1983, no matter how extreme the alleged wrongdoing, against "all persons - governmental or otherwise - who [are] integral parts of the judicial process."  Briscoe v. LaHue, 460 U.S. 325, 335 (1983).

It is well-established that parties and witnesses are absolutely immune from liability for damages for their testimony or statements, even if false or defamatory, made in connection with judicial proceedings.  Briscoe v. LaHue, 460 U.S. 325 (1983); Petyan v. Ellis, 200 Conn. 243, 245 (1986). The rationale for such immunity is that without it, "witnesses might be reluctant to come forward to testify [a]nd once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability.  Briscoe, 460 U.S. at 333.  Accordingly, "[a]bsolute immunity is . . . necessary to assure that judges,

26

advocates, and witnesses can perform their respective functions without harassment or intimidation." Id. at 335; Burns v. Reed, 500 U.S. 478, 494 (1991).

Here, plaintiff's claims against Assistant State's Attorney McNamara rest solely upon her role as a witness. Her statements are protected by the absolute immunity provided to witnesses in any quasi-judicial proceeding. Plaintiff's claims against Attorney McNamara are barred by absolute immunity.

**F.    All Defendants are Entitled to Qualified Immunity.**

Under the doctrine of qualified immunity, state officials performing discretionary functions are shielded from liability for civil damages if their conduct either "did not violate clearly established rights of which a reasonable person would have known," or "it was objectively reasonable to believe that [his] acts did not violate [those] clearly established rights." Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998) (citations omitted). See Saucier v. Katz, 533 U.S. 194, 200-201 (2001); Brown v. City of Oneonta, 106 F.3d 1125, 1130-31 (2d Cir. 1997). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. Thus, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

In order to prevail on an action for damages under § 1983 against a government official, a plaintiff must demonstrate that the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known."

Conn v. Gabbert, 526 U.S. 286, 290 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Thus, the two-step inquiry requires first, whether the plaintiffs allege a violation of a constitutional right, and then second, whether that right was "clearly established" at the time of the alleged violation.  Saucier v. Katz, 533 U.S. 194, 200-201 (2001); Gabbert, 526 U.S. at 290.  After this test is met, the qualified immunity defense "protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of his challenged act."  Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001) (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)).  See Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").  *See also* Munato v. Metropolitain Transp. Authority, 285 F.3d 201 (2002).

None of the actions taken by any of the defendants would, even with all deference granted to the plaintiff, constitute an allegation of a violation of a constitutional right.  Moreover, even if, by some extreme stretch a constitutional violation could be found, there are no allegations that a reasonable official in the positions of the defendants would be on notice that their actions were unconstitutional.  Accordingly, all of the defendants are entitled to qualified immunity.

## CONCLUSION

Plaintiff's entire case rests upon the sole fact that the initial investigator in the Rodriguez IA investigation, Sgt. Kenefick, originally "exonerated" him.  He concedes that Rodriguez was arrested, transported to the Task Force offices, interrogated and subsequently released.  He concedes that none of those activities were documented anywhere.  And he concedes, as he must, that Sgt. Kenefick's chain of command was

not bound by Kenefick's initial conclusions.  As the undisputed facts reveal, Kenefick's November 6th "exoneration" did not survive his supervisor's initial screening.  By the time Captain Samuels signed the IA report to go up to the Colonel's office on November 20th, Kenefick had sustained the charge on the issue of plaintiff's failure to document Rodriguez's arrest, the place of interrogation and subsequent release.

Moreover, it is undisputed that Kenefick's chain of command was not bound by his factual or policy conclusions.  The investigation was sent back with instructions to include plaintiff's supervisor.  Two senior police officers were troubled by Sgt. Lynch's cavalier actions on the evening of November 28, 2000.  Plaintiff's discomfort with their censure does not translate this matter into a constitutional due process claim or this Court into an alternative means to trump the grievance process.

All of the named defendants have immunity; either absolute, such as witness immunity, or qualified immunity.  Moreover, as section 1983 jurisprudence makes clear, an official cannot be held liable for his supervisory position: the official can only be held liable for his or her individual actions.

For the all the above reasons, the defendants request that summary judgment be entered on their behalf for all counts.

DEFENDANTS Kathy McNamara,
Timothy Barry and Frank Griffin in their
individual capacities

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:     _____
        Clare E. Kindall
        Assistant Attorney General
        Federal Bar No. ct13688
        55 Elm Street, P.O. Box 120
        Hartford, CT  06141-0120
        Tel: (860) 808-5020
        Fax: (860) 808-5347
        Clare.Kindall@po.state.ct.us

### CERTIFICATION

I hereby certify that a copy of the foregoing Memorandum in Support of

Defendants' Motion for Summary Judgment was served by first-class mail, postage

prepaid, in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this

23rd day of March,  2004 to:

Sebastian O. DeSantis, Esq.            Gilbert Shasha, Esq.
Sabilia & DeSantis, LLC                37 Granite Street
247 Shaw Street                        P.O. Box 1736
P.O. Drawer 191                        New London, CT 06320
New London, CT 06320

And a copy by interoffice mail to:

Mark P. Kindall, AAG
Office of the Attorney General
55 Elm Street, 4th Floor
Hartford, CT 06106


        _____
        Clare E. Kindall
        Assistant Attorney General