UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TODD LYNCH, | : | CIVIL ACTION NO. 3:03CV0381(MRK) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| KATHY MCNAMARA, | : | |
| TIMOTHY BARRY, and | : | |
| FRANK GRIFFIN, in their individual | : | |
| Capacities | : | |
| *Defendants* | : | MARCH 23, 2004 |

## **DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Rule 56(a)(1), the following material facts are not in dispute for the purpose of ruling on the present motion for summary judgment. The exhibits, affidavits and deposition transcripts accompany this Statement under separate cover.[1]

1. The plaintiff, Todd Lynch ("plaintiff," "Lynch" or "Sgt. Lynch"), has been employed by the Connecticut State Police since September 1987. Lynch dep. 39-40.

2. Upon leaving the academy in late 1988, he was assigned to Troop K in Colchester, and was subsequently transferred to Troop E in Montville in the early 1990s. Lynch dep. 39-41. He was promoted to Sergeant in 1997, transferred back to Troop K and acted as a patrol supervisor. Lynch dep. 42.

---

[1] Evidence is submitted in two packages. Documentary Exhibits are numbered as Exhibit nos. 1 through 29, and are submitted simultaneously with this Statement. Where available, page numbers reference the Bates number stamped on the bottom. Deposition exhibits have been renumbered, but are referenced in the list of documentary exhibits. The testamentary evidence is submitted separately, in the form of affidavits, discovery responses, and the deposition testimony (plaintiff's and a third-party witness, Sgt. Paul Kenefick). The testamentary evidence is marked as Exhs. A-G.

1

3. At its inception in July 2000, he joined the Statewide Firearms Trafficking Task Force (the "Task Force"), reporting directly to Lt. Thomas Hogarty. Lynch dep. 46-47.

4. After two citizen complaints were filed against him in early 2001, Lynch voluntarily transferred off the Task Force to Troop E in Montville. Lynch dep. 48. The transfer was his idea; no one suggested it to him. Id.

5. After he transferred back to Troop E, Lynch became a Community Policing supervisor, which is more prestigious than a patrol supervisor. Lynch dep. 48-49.

6. He then was assigned to his current position as resident state trooper in Ledyard. Lynch dep. 49. As Ledyard's resident state trooper, he manages the entire Ledyard police force, and is answerable only to Ledyard's mayor and the Lieutenant at Troop E. Lynch dep. 48-49.

7. Sgt. Lynch is a member of the State Police Union Bargaining Unit. Lynch dep. 51. The next rank up (lieutenant) is not a member of the Union. Id.

**THE POLICY AND CONTRACTUAL FRAMEWORK FOR IA INVESTIGATIONS**

8. Chapter 5 of the State Police Administrative & Operations ("A&O") policy manual sets forth the procedures for internal investigations. See Exh. 1.

9. The A&O policy manual requires that all citizen complaints reduced to writing must be thoroughly investigated. Exh. 1, §5.1.2(a) at p. 619; §5.2.1.1(b) at p. 624; §5.2.6(a) at p. 628. See also Affidavit of Frank Griffin ¶ 14 ("Griffin Aff.")

10. The union contract states that citizen who complains about Trooper conduct "shall be encouraged" to "identify themselves;" and to "reduce their complaint to a written statement promptly, normally within ten days" of the oral complaint. Exh. 2,

Article 15, Section Eleven.  "An <u>oral</u> complaint which is not promptly reduced to writing … shall not be investigated" unless it is a criminal charge, or "a charge which the Department is otherwise required by law to investigate."  <u>Id</u>.

11. The contractual provision does <u>not</u> require that the citizen complaint be brought within ten days of the incident.  Griffin Aff., ¶ 13; Lynch dep. 92-94.

12. The department must investigate all citizen complaints made to it that are (i) reduced to writing; (ii) oral and subsequently reduced to writing; (iii) oral concerning criminal behavior; or (iv) any charge the Department is required by law to investigate.  *See* section 5.2.6 of the A&O Manual; Griffin Aff., ¶ 14.  See also Lynch dep. 138-139.

13. The more serious citizen complaints are typically investigated by the Internal Affairs Unit.   Affidavit of Sarah Kasacek ("Kasacek Aff.") ¶ 3.

14. In the Internal Affairs Unit, an investigator is assigned to the complaint.  The investigator's conclusions and findings must be written up in a report with his or her conclusions.  Kenefick dep. 10-11; Exh. 1, § 5.2.8.  Both the report and its conclusions are then sent up the chain-of-command, with each level being required to sign-off on the report and its conclusions.  Kenefick dep. 21-23.

15. For the two Lynch IA Investigations, the investigator was Sgt. Paul Kenefick, who reported to Lt. Sarah Kasacek, who reported to Captain Paul Samuels in the Internal Affairs Unit.  Kenefick dep. 7-8.  Once the Unit approved of the report and its conclusions, it would be sent to the Colonel's office for review and approval.  Kasacek Aff., ¶ 4.

16. The ultimate disposition of an IA is made by a commander or manager who is delegate the responsibility by the Commissioner. Exh. 1, §5.2.(c) at p. 633; §5.2.10 at pp. 633-634.

17. For purposes of the two IA investigations regarding Sgt. Lynch, Colonel Timothy Barry was delegated the responsibility by the Commissioner. Griffin Aff., ¶ 5; Kasacek Aff., ¶ 6.

18. Colonel Barry had final say as to the result of the Lynch IA investigations. He could reverse every single finding of the investigator. Lynch dep. 59-60, 125; Kenefick dep. 45-46; Kasacek Aff., ¶¶ 6-8.

19. Colonel Barry did not need to defer to an investigator's factual conclusions in an internal investigation, for the factual conclusions are also within Colonel Barry's discretion. Kenefick dep. 58; Kasacek Aff., ¶¶ 6-8.

20. Unless the complaint alleges a crime has been committed, the A&O policy manual requires that the employee under investigation be given written notice of the complaint made against him or her. Exh. 1, §5.2.7(b) at p. 629.

21. During an Internal Affairs ("IA") investigation, the bargaining unit employee under investigation has the right to be accompanied by a union representative during an investigatory interview. Exh. 1, §5.2.7(d)(2) at p. 630. *See also* Exh. 2, Article 15, Section Seven (a).

22. An investigatory interview cannot be recorded or transcribed without the knowledge of all participants. Exh. 1, §5.2.7(d)(4) at p. 630.

23. Under the Union contract, Sgt. Lynch has the right to grieve the results of an internal affairs investigation. *See* Articles 14 & 15 of Union Contract Union, Exh. 2; Exh. 27 at 2.

**THE ANDERSON IA INVESTIGATION**

24. Lynch was the subject to two IA investigations arising out of Task Force arrests conducted in November 2000. Exhs. 4, 7, 13, 23, 25; Kasacek Aff., ¶ 9.

25. The first IA investigation, given case number IA01-001, arose from a complaint filed on January 3, 2001 by the State's Attorney's Office. The State's Attorney's Office alleged that Sgt. Lynch supervised an investigation that ultimately lead to an improper arrest of Tye Anderson on November 2, 2000, lacking probable cause. The compliant also alleged that Sgt. Lynch threatened a witness to the investigation in order to obtain a statement from her. Exh. 4 at 2.

26. The State's Attorney's Office complaint indicated that Sgt. Lynch had pushed matters too close to the edge in the Anderson arrest and in threatening a witness about DCF. Lynch dep. 95.

27. Lynch was given notice of the State's Attorney's January 3, 2001 complaint on January 4, 2001. Exh. 4. Lynch does not contend that the IA unit failed to give him timely notice. Lynch dep. 88-90.

28. Although the Anderson IA investigation was initial assigned to Sgt. Edward Gould, Sgt. Gould recused himself, because he was friends with Sgt. Lynch. Kenefick dep. 7; Kasacek Aff., ¶ 11. The Anderson IA investigation was then assigned to Sgt. Paul Kenefick on January 6, 2001. Kenefick dep. 7, 42-43; Exh. 7 at 2.

29. Kenefick was assigned to the Internal Affairs Unit from May 19, 2000 to August 10, 2001. Kenefick dep. 41. Kenefick transferred out of the Internal Affairs Unit in August 2001 to accommodate personal scheduling needs. Kenefick dep. 41. At the time he transferred out, both Lynch IA investigations were complete, but neither report had been drafted. Kenefick dep. 41-42.

30. With respect to the Tye Anderson IA Investigation, Kenefick interviewed nine witnesses, interviewing Lynch last. Exh. 7; Kenefick dep. 9. Lynch was accompanied by his union representative Jeremiah McGuire during his interview. Exh. 7 at 14.

31. A true and accurate chronology of actions taken by Kenefick in the Anderson IA Investigation is set forth in Exh. 5. Lynch dep. 103.

32. Lynch believes that Kenefick's investigation in the Anderson IA investigation was fair and impartial. Lynch dep. 96-97. Lynch's only procedural concern with the Anderson IA investigation was his view that Gould was "removed" from the investigation. Id.

33. On September 23, 2001, Kenefick submitted his investigatory report on the Anderson IA Investigation, case number IA01-001. Exhs. 6-7. In his report, Kenefick exonerated Lynch on the improper arrest charge, and found as "unfounded" the charges of conduct unbecoming of an officer, and improper decorum. Exh. 7 at 20-21.

34. On October 1, 2002, Colonel Barry agreed with Kenefick's recommendations and held that with respect to the State's Attorney's Office complaint regarding the Anderson arrest, the charges against Sgt. Lynch were exonerated and unfounded. Exh. 4 at 2; Kasacek Aff. ¶ 12.

6

35. Lynch did not grieve the results of the Anderson IA Investigation. Lynch dep. 21.

**THE RODRIGUEZ IA INVESTIGATION**

36. Ruben Rodriguez was suspected to be an illegal gun dealer, as he had been flagged as a high volume purchaser of guns but had none of the firearms in his possession. Exh. 23 at bates 24, 38-39.

37. During the evening of November 28, 2000, Lynch arrested Rodriguez because he had not given notice of his change of address on his pistol permit within thirty (30) days. Exh. 23 at 39. Lynch did not have probable cause to arrest Rodriguez for any other firearm charge. Lynch dep. 115.

38. The normal procedure for an arrest is to bring the prisoner to a police station or troop barracks, to read him his rights, fingerprint him, photograph him, long him into a cell and release on bond. Lynch dep. 110.

39. Rather than bringing Rodriguez to the barracks to be processed, Lynch brought Rodriguez back to the Task Force offices. Rodriguez was read his rights and informed him of the charges, but did none of the other usual procedures. Lynch dep. 110.

40. During his interview at the Task Force Offices, Rodriguez eventually confessed that he had sold the guns "on the streets of Hartford". Exh. 23 at 39-40; Exh. 10.

41. Lynch then signed Rodriguez up as a confidential informant and released him. Exh. 23 at 39-40. *See also* Exh. 23 at 41-44.

7

42. Lynch did not document the arrest or subsequent release of Rodriguez. Lynch dep. 120-121, 128-129; Exh. 23 at 44. Lynch did not even document that Rodriguez was transported back to the Task Force's office to be interrogated, rather than to a Troop barracks or local police station to process the arrest. Id.

43. The only paperwork generated was the report of Rodriguez signing up as a confidential informant, his witness statement, a property seized report and an investigation report that noted that an arrest was still "pending." Exh. 23 at 44; Exhs. 8-12.

44. Lynch contends that he released Rodriguez under the direction of Assistant State's Attorney Cathy McNamara, pursuant to a telephone call to her house. Exh. 23 at 39.

45. Attorney McNamara denies knowing that Rodriguez was under arrest when she spoke with the Task Force. Exh. 23 at 26; Exhibit E (McNamara discovery responses). Rather, McNamara contends that the first time she was aware that Rodriguez had been arrested on November 28, 2000 was after Rodriguez came to court in January 2001 for his arrest pursuant to a warrant for his illegal sale of guns. Id.

46. On March 28, 2001, Ruben Rodriguez made a citizen complaint against Todd Lynch. Exh. 13 at 2. As set forth in the written report of the complaint, Rodriguez made:

> Allegations of improper arrest/detaining of subject and threats toward subject in order to obtain a written statement. Also allegations of conducting a search of a residence without proper consent and failure to maintain the privacy of a registered "confidential informant".

Exh. 13 at 2.

47. The complaint summarized Rodriguez's charges as:

> The complainant has made allegations stating he was handcuffed and detained for an extended period of time and later released without being arrested. The Complainant also alleges that when he was "taken into custody" at his girlfriend's residence, his girlfriend was coerced into giving consent to search her apartment. The Complainant also states that he signed papers registering him as a "confidential informant" and his identity was later released to the media by the State Police.

Exh. 13 at 2.

48. The A&O policy manual also has a procedure to address the release of or "un-arrest" of prisoners. Section 19.1.16(a)(2) states:

> "no arrest shall be voided, reduced, or dismissed against a suspect except by authorization of the court of jurisdiction (except 19.1.18c). In all other situations officers may not "unarrest" anyone."

Exh. 3.

49. The Rodriguez IA investigation was assigned to Sgt. Paul Kenefick on March 27, 2001, and given case number IA01-024. Kenefick dep. 7; Exh. 14; Kasacek Aff. ¶ 13.

50. Lynch was provided a hand-delivered copy of the March 28, 2001 Rodriguez complaint on March 29, 2001. Exh. 14 at 1. Lynch does not contend that the department did not give him timely notice. Lynch dep. 105-106, 117.

51. A true and accurate chronology of actions taken by Kenefick in the Rodriguez IA Investigation is set forth in Exh. 14. Kenefick dep. 54.

52. With respect to the Rodriguez IA Investigation, Kenefick interviewed eleven witnesses. Exh. 14; Exh. 23.

9

53. Sgt. Lynch was interviewed by Sgt. Kenefick and Sgt. Nancy Vitone on August 1, 2001. Lynch was informed that the interview was being recorded. A true and accurate copy of the interview transcript is marked as Exh. 15. Lynch dep. 80-82.

54. Lynch's union representative, Jeremiah McGuire, accompanied Lynch during the August 1, 2001 interview. Exh. 15; Lynch dep. 54.

55. On August 12, 2001, Kenefick transferred out of the Internal Affairs Unit, but maintained the responsibility to issue reports in the two Lynch investigations. Kenefick dep. 41-42; Kasacek Aff. ¶ 15.

56. Lynch believes that Kenefick's investigation in the Rodriguez IA investigation was fair and impartial. Lynch dep. 117, 165.

57. On November 6, 2001, Kenefick submitted his completed report on the Rodriguez IA Investigation to Professional Standards for Review. Exh. 14 at 58; Exh. 16

58. In his Initial Report, Kenefick either exonerated Lynch on the Rodriguez charges or found the charges as unfounded. Kenefick dep. 13-15, 27-28; Kasacek Aff. ¶ 16; Exh. 16 at 747-748. In his initial report, Kenefick noted that Lynch should have recorded his actions of the night of November 28, 2000. See Exh. 16 at 747; Kenefick dep. 16-17; Kasacek Aff. ¶ 16.

59. Sgt. Kenefick's immediate supervisor, Lt. Sarah Kasacek, disagreed with Sgt. Kenefick's conclusion regarding the "un-arrest" of Ruben Rodriguez. Kasacek Aff. ¶ 17.

60. On or about November 6, 2001, Lt. Sarah Kasacek contacted the Department's Labor Relations Unit for "guidance in regards to the issue of Mr. Rodriguez

being taken into custody, the nullification of arrest and the failure to document such actions." Exh. 14 at 58; Kasacek Aff., ¶ 18.

61.  On or about November 20, 2001, the labor relations unit advised that an additional violation of failing to document the activities of November 28, 2000 should be sustained. Exh. 14 at 58; Kenefick dep.14-18; Kasacek Aff. ¶ 19. Kenefick had "no problem" with the suggested change and resubmitted his report. Exh. 14 at 58; Kenefick dep. 14-18. *See also* Exh. 21 at 381 (Lynch informed during 2/13/02 interview that one charge had been sustained).

62.  With the issue now sustained, Captain Samuels signed off on the report on November 20, 2001 and forwarded it to Lt. Sweetman for review. Kasacek Aff., ¶ 20; Exh. 25.

63.  Internal affairs reports commonly go up and down the chain of command with changes and suggestions. Kenefick dep. 17-18; Kasacek Aff., ¶ 7.

64.  At that point, Kenefick's involvement with the Rodriguez IA Investigation ended. Kenefick dep. 32-33, 51-52; Kasacek Aff., ¶ 21.

65.  Kenefick thought that "reasonable minds could differ" as to whether Lynch had violated the A&O policy manual's nullification of arrest provision Kenefick dep. 45-47. Kenefick interpreted the provision "court of jurisdiction" in section 19.1.16(a)(2) as meaning Attorney McNamara. Kenefick dep. 45-46. *See also* Lynch dep. 113-114.

66.  Kenefick believed Lynch and disbelieved McNamara regarding the content of the telephone call of November 28, 2000. Kenefick dep. 58. However, the factual dispute between Lynch and McNamara does not impact how one interprets the "court of jurisdiction" requirement in section 19.1.16c. Kenefick dep. 57-58.

11

67. Kenefick's co-investigator, Sgt. Regina Rush-Kittle, strongly felt that Lynch had improperly released the prisoner. Kenefick dep. 46-47.

68. On or about November 30, 2001, the Rodriguez IA Investigation was sent back to the Internal Affairs Unit, with instructions to add Lynch's supervisor, Lt. Thomas Hogarty as a subject of the IA. Exh. 17; Kasacek Aff., ¶ 22. Lt. Sweetman heavily marked-up the report, questioning the conclusions based upon the testimony provided by the various witnesses. Kasacek Aff., ¶ 22.

69. Because the additional subject of the investigation was of a higher-rank than Sgt. Kenefick, it would not have been appropriate for Kenefick to conduct the expanded investigation. Kenefick dep. 51-52; Kasacek Aff., ¶ 23. Moreover, Sgt. Kenefick had transferred out of the Unit more than three months previously. Kasacek Aff., ¶ 23.

70. Lt. Kasacek conducted the expanded investigation from December 2001 through January 2002. Exh. 17; Kasacek Aff., ¶ 23.

71. On or about December 6, 2001, Lt. Thomas Hogarty was given notice that IA01-024 had been expanded to include him. Exh. 19; Kasacek Aff., ¶ 24. He objected to being investigated by someone who held his own rank. Kasacek Aff. ¶ 24; Exh. 20.

72. On or about January 24, 2002, Attorney McNamara was interviewed by Lt. Kasacek and Sgt. Joseph Froehlich. Exh. 23 at 26; Kasacek Aff., ¶ 26.

73. On or about January 28, 2002, the investigation was re-assigned to Capt. Lapacrucia, with Lt. Kasacek's continued assistance. Kasacek Aff. ¶ 25; Exh. 18.

74. Both Lapacrucia and Kasacek agreed that both subjects of the investigation needed to be re-interviewed. Kasacek Affidavit ¶ 26; Exh. 18.

75. Lynch was interviewed by Capt. Lacaprucia and Lt. Sarah Kasacek on February 13, 2002. Exh. 21; Kasacek Aff., ¶ 27. A true and accurate copy transcript of his interview is marked as Exh. 21.

76. Lynch was provided the transcript of his August 1, 2001 interview before his February 13, 2002 interview. Exh. 21 at 379; Exh. 21 at 1; Kasacek Aff., ¶ 27.

77. Lynch was informed during his interview that the reason Capt. Lacaprucia was involved was that another subject with a higher rank had surfaced within the scope of the IA. Exh. 21 at 379.

78. On or about March 19, 2002, Lt. Kasacek and Captain Lacaprucia submitted their report on the investigation. Lt. Kasacek drafted the full report and Capt. Lacaprucia drafted the executive summary. Exhs. 22-23; Kasacek Aff., ¶ 28.

79. In their report, they recommend that charge of incompetence against Lt. Hogarty be not sustained. Exh. 23 at 44; Kasacek Aff. ¶ 29. For the charges against Sgt. Lynch, they recommend that the improper arrest, improper consent to search, and decorum charges be either unfounded or not sustained. Id., 44-46. They recommended that the charge of improperly releasing prisoners in violation of section 19.1.16(a)(2) be sustained. Id.

80. Captain Lacaprucia and Lt. Kasacek were quite troubled by Sgt. Lynch's actions after the arrest of Rodriguez. Kasacek Aff., ¶ 30. Sgt. Lynch should have brought the prisoner to a police department or a troop barracks, not back to the Task Force Offices. Id. He should have properly processed the prisoner, including fingerprints and filling out a prisoner processing report and an arrest report. Id. They were concerned that he subsequently "un-arrested" the prisoner, with virtually no record

of either the arrest or the "un-arrest". Id. They had absolutely no doubt that he violated section 19.1.16c of the A&O manual. Id.

    81.    On or about April 9, 2002, Colonel Barry agreed with their conclusions, and sustained the charge against Lynch of improperly releasing prisoners. Exh. 25 at 4; Kasacek Aff., ¶31. At that point, the IA Unit had no further role in the matter. The IA Unit does not suggest or impose discipline. Kasacek Aff., ¶ 32.

**DISCIPLINE IMPOSED DUE TO RODRIGUEZ IA INVESTIGATION**

    82.    Major Frank Griffin is the Commanding Officer of the Bureau of Investigations. Griffin Aff., ¶¶ 1-2. Because Sgt. Lynch was working in the State Firearms Trafficking Task Force within the Bureau of Investigations during the incidents underlying the Rodriguez IA Investigation, when a charge was sustained in that investigation, it became Major Griffin's responsibility to administer the discipline applied. Griffin Aff., ¶ 3. He had no role in the IA Investigation. Id.

    83.    Major Griffin did not make the decision as to what type of discipline would be imposed upon Sgt. Lynch for the charge sustained in the Rodriguez IA Investigation. Griffin Aff., ¶ 4. Rather, the Labor Relations Department reviewed the sustained charge, compared the matter with the discipline imposed in other IA Investigations, and made a recommendation to the Colonel as to the appropriate level of discipline to be applied. Id. Once the Colonel agreed with the recommendation, the discipline to be imposed was conveyed to Major Griffin. Id.

    84.    For the sustained charge against Lynch in the Rodriguez IA Investigation, Major Griffin was informed that the consequences should consist of (i) an oral counseling reduced to writing; and (ii) a disciplinary transfer to Troop E. Griffin Aff., ¶ 6.

85. On or about April 25, 2002, Sgt. Lynch received written notice to meet with Major Frank Griffin on April 30, 2002 in order to receive the discipline for his un-arrest of Ruben Rodriguez, with an attached copy of the completed investigation. Exh. 26; Griffin Aff., ¶ 7. *See also* Lynch dep. 146.

86. On or about April 30, 2003, Sgt. Lynch and Lynch's union representative met with Major Griffin, and Lynch received a disciplinary transfer to Troop E and an Oral Counseling Reduced to Writing for his un-arrest of Ruben Rodriguez. Griffin Aff., ¶ 8; Exh. 27.

87. An Oral Counseling Reduced to Writing is not considered to be disciplinary action. Griffin Aff., ¶ 10.

88. Sgt. Lynch's disciplinary "transfer" to Troop E was a paper transfer only, for he was transferred to a Troop where he had already been working for a year. Kenefick dep. 34-35; Griffin Aff. ¶ 9.

89. Sgt. Lynch retained his same rank, same base pay, normal union steps in pay raises and obtained even more prestigious positions after the "transfer". Lynch dep. 119-120; Griffin Aff. ¶ 9.

90. Lynch's current position as Resident State Trooper at Ledyard is a more lucrative than his position as a sergeant on the Task Force. Lynch dep. 176-177.

91. Lynch made more money in overtime after he left the Firearms Task Force than he did on the Task Force. Lynch dep. 27-28.

92. A state trooper has no contractual, statutory or legal right to overtime hours. Lynch dep. 28.

93.

**UNION GRIEVANCE**

94. Within 20 days of imposition of discipline on April 30, 2002, Lynch filed a timely grievance regarding the disciplinary transfer. Exh. 28; Lynch dep. 147-148. In his grievance he was seeking compensation for lost wages, and his only lost wages claim was lost overtime opportunities. Lynch dep. 147-148.

95. On or about November 1, 2002, Lynch settled his grievance by a Stipulated Agreement that changed the designation of the transfer from disciplinary to administrative. Exh. 29; Lynch dep. 148-149.

**LAWSUIT CLAIMS AGAINST INDIVIDUAL DEFENDANTS**

96. Lynch's claims against Colonel Barry are not that he directly manipulated the investigative process, but because he has "overall control of what is happening within the agency." Lynch dep. 171; amended complaint ¶19. Lynch's claim against Colonel Barry is based upon Colonel Barry's position, not because of what Barry personally did. Lynch dep. 171.

97. Lynch's claim against Major Griffin is that his discipline was disproportionate. Lynch dep. 171-172; amended complaint ¶22.

98. Lynch's sole claim against Assistant State's Attorney Kathy McNamara is his view that she "flat-out lied" during the IA Investigation. Lynch dep. 173-175. *See also* Lynch dep. 143. (no knowledge that McNamara ever knew Noble drove Rodriguez to make complaint.)

99. Lynch seeking to overturn the results of the Rodriguez IA investigation. Lynch dep. 149-150.

                                      DEFENDANTS Kathy McNamara,
                                      Timothy Barry and Frank Griffin in their
                                      individual capacities

                                      RICHARD BLUMENTHAL
                                      ATTORNEY GENERAL


BY:       _____
              Clare E. Kindall
              Assistant Attorney General
              Federal Bar No. ct13688
              55 Elm Street
              P.O. Box 120
              Hartford, CT  06141-0120
              Tel: (860) 808-5020
              Fax: (860) 808-5347
              Clare.Kindall@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a true and accurate copy of the foregoing Defendants' Statement of Material Facts Not in Dispute was served in accordance with Rule 5(b) of the Federal Rules of Civil Procedure by first-class mail, postage prepaid, on this 23rd day of March, 2004 to:

| | |
|---|---|
| Sebastian O. DeSantis, Esq. | Gilbert Shasha, Esq. |
| Sabilia & DeSantis, LLC | 37 Granite Street |
| 247 Shaw Street | P.O. Box 1736 |
| P.O. Drawer 191 | New London, CT 06320 |
| New London, CT 06320 | |

And by interoffice mail to:

    Mark P. Kindall, AAG
    Office of the Attorney General
    55 Elm Street, 4th floor
    Hartford, CT 06106


                                      _____
                                        Clare E. Kindall
                                        Assistant Attorney General